UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

BOBBIE JOHNSTON,

       Plaintiff,                                            Hon. Richard Alan Enslen

v.                                                              Case No. 1:05-CV-706

COMMISSIONER OF SOCIAL
SECURITY,

       Defendant.
_____/

## REPORT AND RECOMMENDATION

       This is an action pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), to review a final decision of the Commissioner of Social Security denying Plaintiff's claim for Supplemental Security Income (SSI) benefits under Title XVI of the Social Security Act. Section 405(g) limits the Court to a review of the administrative record, and provides that if the Commissioner's decision is supported by substantial evidence, it shall be conclusive.

       The Commissioner determined that Plaintiff is not disabled as defined by the Act. Pursuant to 28 U.S.C. § 636(b)(1)(B), authorizing United States Magistrate Judges to submit proposed findings of fact and recommendations for disposition of social security appeals, the undersigned recommends that the Commissioner's decision be **affirmed**.

**STANDARD OF REVIEW**

The Court's jurisdiction is confined to a review of the Commissioner's decision and of the record made in the administrative hearing process. *See Willbanks v. Sec'y of Health and Human Services*, 847 F.2d 301, 303 (6th Cir. 1988). The scope of judicial review in a social security case is limited to determining whether the Commissioner applied the proper legal standards in making her decision and whether there exists in the record substantial evidence supporting that decision. *See Brainard v. Sec'y of Health and Human Services*, 889 F.2d 679, 681 (6th Cir. 1989).

The Court may not conduct a de novo review of the case, resolve evidentiary conflicts, or decide questions of credibility. *See Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). It is the Commissioner who is charged with finding the facts relevant to an application for disability benefits, and her findings are conclusive provided they are supported by substantial evidence. *See* 42 U.S.C. § 405(g). Substantial evidence is more than a scintilla, but less than a preponderance. *See Cohen v. Sec'y of Dep't of Health and Human Services*, 964 F.2d 524, 528 (6th Cir. 1992) (citations omitted). It is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Bogle v. Sullivan*, 998 F.2d 342, 347 (6th Cir. 1993). In determining the substantiality of the evidence, the Court must consider the evidence on the record as a whole and take into account whatever in the record fairly detracts from its weight. *See Richardson v. Sec'y of Health and Human Services*, 735 F.2d 962, 963 (6th Cir. 1984).

As has been widely recognized, the substantial evidence standard presupposes the existence of a zone within which the decision maker can properly rule either way, without judicial interference. *See Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citation omitted). This

standard affords to the administrative decision maker considerable latitude, and indicates that a decision supported by substantial evidence will not be reversed simply because the evidence would have supported a contrary decision. *See Bogle*, 998 F.2d at 347; *Mullen*, 800 F.2d at 545.

## PROCEDURAL POSTURE

Plaintiff was 37 years of age at the time of the ALJ's decision. (Tr. 17). She earned a General Educational Development (GED) diploma and worked previously as a food packager and production worker. (Tr. 17, 149, 214-17).

Plaintiff first applied for benefits on December 5, 1997, alleging that she had been disabled since January 1, 1996, due to borderline intellectual functioning and seizures. (Tr. 44, 82-83). Plaintiff's application was denied and she did not pursue the matter further. (Tr. 36-46).

Plaintiff applied for benefits on April 19, 2001, alleging that she had been disabled since May 25, 2000, because her lower back "pops" and her left leg "goes numb at times." (Tr. 47, 85-87). Plaintiff's application was denied and she did not pursue the matter further. (Tr. 47-50).

Plaintiff next applied for benefits on April 19, 2002, alleging that she had been disabled since May 25, 2000, due to back pain and a "past history of depression." (Tr. 51, 89-91). Plaintiff's application was denied and she did not pursue the matter further. (Tr. 51-54).

Plaintiff again applied for benefits on December 13, 2002, alleging that she had been disabled since May 25, 2000, due to back pain. (Tr. 95-98, 205). Plaintiff's application was denied, after which time she requested a hearing before an Administrative Law Judge (ALJ). (Tr. 55-84). On November 29, 2004, Plaintiff appeared before ALJ James Prothro, with testimony being offered by Plaintiff and vocational expert, Dan O'Neil. (Tr. 607-44). In a written decision dated April 13,

2005, the ALJ determined that Plaintiff was not disabled. (Tr. 16-27). The Appeals Council declined to review the ALJ's decision, rendering it the Commissioner's final decision in the matter. (Tr. 5-7). Plaintiff subsequently appealed the matter in this Court pursuant to 42 U.S.C. § 405(g).

## MEDICAL HISTORY

On February 17, 1997, Plaintiff was examined by Dr. Lori Schuh. (Tr. 262-63). Plaintiff reported that she experienced seizures. (Tr. 262). According to Plaintiff, her seizures were characterized by "a blackout with shaking" with "posturing and elevation of the upper extremities with quivering of the extremities and gasping." She reported that her seizures sometimes involve "more vigorous movements, including back arching." When questioned about the duration of her seizures, Plaintiff reported that "most last 15 minutes," but that some "go on for up to five hours." *Id.* The results of a physical examination were unremarkable. (Tr. 262-63). Dr. Schuh concluded that Plaintiff's seizures were "likely to be of psychogenic origin" and recommended to Plaintiff that she participate in long-term EEG monitoring to determine if such was the case. (Tr. 263).

From March 27, 1997, through March 29, 1997, Plaintiff participated in a long-term EEG examination. (Tr. 258-59). During this time Plaintiff experienced a "typical" seizure characterized by "unresponsiveness and asymmetric flapping and jerking of the extremities." (Tr. 259). However, the results of the EEG examination were "normal" with no evidence of epileptiform discharge. Dr. Schuh concluded that Plaintiff was experiencing pseudoseizures for which treatment with a psychologist was recommended. *Id.*

On January 21, 1998, Plaintiff was examined by Blaine Pinaire, Ph.D. (Tr. 277-80). Plaintiff reported that she suffered from seizures. (Tr. 277). The results of a mental status

4

examination were unremarkable. (Tr. 278-79). Plaintiff participated in the Weschler Adult Intelligence Scale, the results of which revealed that Plaintiff possessed a verbal IQ of 74, a performance IQ of 87, and a full-scale IQ of 77. (Tr. 273-74). Plaintiff was diagnosed with an anxiety disorder and her GAF score was rated as 66.[1] (Tr. 279).

On March 26, 1998, William Hampstead, Ph.D. completed a Psychiatric Review Technique form regarding Plaintiff's mental limitations. (Tr. 286-94). Determining that Plaintiff suffered from "significantly subaverage general intellectual functioning" as well as an anxiety disorder, the doctor concluded that Plaintiff satisfied the Part A criteria for Section 12.05 (Mental Retardation and Autism) and Section 12.06 (Anxiety-Related Disorders) of the Listing of Impairments. (Tr. 288-92). The doctor determined, however, that Plaintiff failed to satisfy any of the Part B criteria for these particular impairments. (Tr. 293). Specifically, the doctor concluded that Plaintiff suffered moderate restrictions in the activities of daily living, slight difficulties in maintaining social functioning, seldom experienced difficulties in maintaining concentration, persistence or pace, and never experienced episodes of deterioration or decompensation in work or work-like settings. *Id.*

Dr. Hampstead also completed a Mental Residual Functional Capacity Assessment form regarding Plaintiff's limitations in 20 separate categories encompassing (1) understanding and memory, (2) sustained concentration and persistence, (3) social interaction, and (4) adaptation. (Tr. 281-83). Plaintiff's abilities were characterized as "moderately limited" in six categories. With

---

[1] The Global Assessment of Functioning (GAF) score refers to the clinician's judgment of the individual's overall level of functioning. American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 30 (4th ed. 1994). A score of 66 indicates that the individual is experiencing "some mild symptoms or some difficulty in social, occupational, or school functioning, but generally functioning pretty well, has some meaningful interpersonal relationships." *Id.* at 32.

respect to the remaining 14 categories, however, the doctor reported that Plaintiff was either "not significantly limited" or that there existed "no evidence of limitation." *Id.*

On May 25, 2000, Plaintiff suffered a "sudden pain" in her lower back after bending to lift an object at work. (Tr. 314). On June 30, 2000, Plaintiff was examined by Dr. Eric Orenstein. An examination of Plaintiff's back revealed tenderness and limited range of motion. Straight leg raising was negative and an examination of Plaintiff's lower extremities revealed no evidence of neurologic abnormality. Plaintiff was diagnosed with a lumbosacral strain and instructed to participate in physical therapy. *Id.*

Plaintiff later reported that physical therapy failed to improve her condition. (Tr. 313). Physical therapy treatment notes, however, reveal that Plaintiff skipped a week of therapy to vacation on Mackinaw Island.

On July 28, 2000, Plaintiff was examined by Dr. Orenstein. Plaintiff complained that she experienced "severe pain with sitting activities," but was observed to be comfortably sitting in a forward flexed position. Straight leg raising produced complaints of pain, but the doctor observed no evidence of neurologic abnormality. *Id.* On August 11, 2000, Plaintiff participated in an MRI examination of her lumbar spine, the results of which revealed "mild" degenerative changes at L4-L5 and "early" degenerative changes at L5-S1. (Tr. 312). The examination revealed no evidence of fracture, dislocation, or herniation. Dr. Orenstein reported that he could not explain Plaintiff's subjective symptoms. *Id.*

On September 11, 2000, Plaintiff was examined by Dr. Girish Juneja. (Tr. 381-84). Plaintiff reported that she was experiencing lower back pain which "on average" rated 9-10 on a scale of 1-10. (Tr. 381). An examination of Plaintiff's back revealed tenderness and limited range

of motion, however, as the doctor noted, Plaintiff exhibited "some element of overreaction" during the examination. (Tr. 383). An examination of Plaintiff's lower extremities revealed 5/5 strength throughout with no evidence of abnormality. Plaintiff was diagnosed with chronic low back pain and mechanical dysfunction. *Id.* Plaintiff was prescribed anti-inflammatory and muscle relaxant medication. (Tr. 384).

On November 6, 2000, Plaintiff was examined by Dr. Juneja. (Tr. 375-76). Plaintiff reported that she was "doing better" and had reduced her intake of medication. (Tr. 375). Plaintiff exhibited "functional" range of motion in her back and "normal" strength in her upper and lower extremities. Straight leg raising was negative. The doctor reported that Plaintiff could perform full-time work activities so long as she not lift more than 20 pounds. *Id.*

When examined on November 27, 2000, Plaintiff characterized her back pain as a "mild discomfort." (Tr. 373). She reported that her back pain was "much better than before" and that she was no longer taking any medications. Dr. Juneja reported that Plaintiff was "musculoskeletally and neurologically stable." *Id.*

On March 26, 2001, Plaintiff participated in an EMG examination of her lower extremities, the results of which revealed no evidence of radiculopathy. (Tr. 362-63).

On March 27, 2001, Plaintiff was examined by Dr. Lisa Pullum. (Tr. 541). Plaintiff reported that she was experiencing back pain which she rated as 10 on a scale of 1-10. Plaintiff was administered an epidural steroid injection. *Id.* When examined by Dr. Pullum on April 12, 2001, Plaintiff rated her back pain as 8-9 on a scale of 1-10. (Tr. 540). Plaintiff was given a facet injection. *Id.*

On April 16, 2001, Plaintiff was examined by Dr. Juneja. (Tr. 356-57). Plaintiff reported that she recently "re-aggravated" her lower back pain. (Tr. 356). An examination of Plaintiff's lower back revealed localized tenderness, but there was no evidence of radiculopathy. Plaintiff exhibited 5/5 strength with normal sensation. Plaintiff was able to stand on her heels and toes and her gait did not exhibit any abnormality. The doctor reported that Plaintiff was suffering from chronic mechanical lower back pain. *Id.*

On May 1, 2001, Plaintiff participated in a diskogram procedure, the results of which were positive at L5-S1. (Tr. 538-39). Plaintiff was administered another pain injection. *Id.*

On May 19, 2001, Plaintiff completed a questionnaire regarding her activities. (Tr. 156-58). Plaintiff reported that she shops, cooks, washes dishes, cares for her child, and washes laundry. *Id.*

On June 28, 2001, Plaintiff received another pain injection. (Tr. 537).

On September 7, 2001, Dr. A. Kapik completed a Psychiatric Review Technique form regarding Plaintiff's mental limitations. (Tr. 388-401). Determining that Plaintiff suffered from a disturbance in mood as well as an adjustment disorder, the doctor concluded that Plaintiff satisfied the Part A criteria for Section 12.02 (Organic Mental Disorders) and Section 12.04 (Affective Disorders) of the Listing of Impairments. (Tr. 389-97). The doctor determined, however, that Plaintiff failed to satisfy any of the Part B criteria for these particular impairments. (Tr. 398). Specifically, the doctor concluded that Plaintiff suffered mild restrictions in the activities of daily living, mild to moderate difficulties in maintaining social functioning, mild to moderate difficulties in maintaining concentration, persistence or pace, and never experienced repeated episodes of decompensation. *Id.*

8

Dr. Kapik also completed a Mental Residual Functional Capacity Assessment form regarding Plaintiff's limitations in 20 separate categories encompassing (1) understanding and memory, (2) sustained concentration and persistence, (3) social interaction, and (4) adaptation. (Tr. 402-05). Plaintiff's abilities were characterized as "moderately limited" in four categories. With respect to the remaining 16 categories, however, the doctor reported that Plaintiff was either "not significantly limited" or that there existed "no evidence of limitation." *Id.*

On June 5, 2002, Plaintiff completed a questionnaire regarding her activities. (Tr. 188-92). Plaintiff reported that her back pain had increased, but that she takes only Tylenol and Motrin. (Tr. 188-89). She reported that she can stand for 60 minutes and sit for 45-60 minutes. (Tr. 190). Plaintiff also reported that she shops, vacuums, washes laundry, cooks, mops, cares for her child, and washes dishes. (Tr. 191).

On July 2, 2002, Plaintiff was examined by Dr. Eric Leep. (Tr. 501-02). Plaintiff reported that she was experiencing low back pain. (Tr. 501). Plaintiff exhibited "full range" of lumbar motion with tenderness on extension and flexion. The results of strength testing were unremarkable. *Id.* Dr. Leep recommended to Plaintiff that she participate in physical therapy, but Plaintiff "flatly refused." (Tr. 502). The doctor next recommended to Plaintiff that she instead attempt swimming, which Plaintiff also "refused." Noting that Plaintiff had "shot down" every suggestion, the doctor concluded that he had "nothing to offer" Plaintiff. *Id.*

On September 26, 2002, Plaintiff was examined by Dr. Pinaire. (Tr. 517-20). Plaintiff reported that she was not depressed and kept herself busy by performing crafts. (Tr. 517). She also reported that she prepared meals, cleaned her house, watched television, visited with relatives, and cared for her son, including playing with him, walking him to the school bus, and

9

helping him with him homework. (Tr. 518). The results of a mental status examination were unremarkable. (Tr. 518-19). Plaintiff was diagnosed with adjustment disorder with depressed mood, in remission. (Tr. 519). Her GAF score was rated as 69. (Tr. 520).

On October 22, 2002, Dr. Stephanie Heard completed a Psychiatric Review Technique form regarding Plaintiff's mental limitations. (Tr. 521-34). Determining that Plaintiff suffered from an adjustment disorder with depressed mood, the doctor concluded that Plaintiff satisfied the Part A criteria for Section 12.04 (Affective Disorders) of the Listing of Impairments. (Tr. 522-30). The doctor determined, however, that Plaintiff failed to satisfy any of the Part B criteria for these particular impairments. (Tr. 531). Specifically, the doctor concluded that Plaintiff suffered no restrictions in the activities of daily living, no difficulties in maintaining social functioning, mild difficulties in maintaining concentration, persistence or pace, and never experienced episodes of decompensation. *Id.*

On November 24, 2003, Plaintiff was examined by Dr. Daniel Mankoff. (Tr. 606). Plaintiff reported that she experienced back pain "all of the time." She further noted, however, that her back pain increased with "prolonged static postures" or bending and twisting, but improved "with changing positions." Plaintiff's gait was "mildly" antalgic. She was able to stand on her heels and toes and "easily" changed from a sitting to a standing position. An examination of Plaintiff's back revealed "decreased" range of motion, but no evidence of spasm. Straight leg raising produced pain, but no evidence of radicular symptoms. *Id.*

Between April 9, 2004, and August 6, 2004, Plaintiff received five pain injections. (Tr. 595-601).

On September 16, 2004, Plaintiff underwent back surgery performed by Dr. Joseph Brown. (Tr. 559). Specifically, the doctor performed a L4 hemilaminectomy with decompression of the nerve root. *Id.*

On September 27, 2004, Plaintiff was examined by Dr. Brown. (Tr. 562). Plaintiff ambulated "without difficulty" and exhibited "intact" motor strength. Straight leg raising was negative. X-rays of Plaintiff's spine were unremarkable. Plaintiff was instructed to participate in physical therapy. *Id.*

On November 2, 2004, Plaintiff was examined by Dr. Brown. (Tr. 560). Plaintiff was able to ambulate without difficulty and straight leg raising was negative. The doctor observed no evidence of motor weakness or sensory deficit. *Id.*

On November 4, 2004, Plaintiff completed a questionnaire regarding her activities. (Tr. 229-34). Plaintiff reported that she helps her son prepare for school every morning and then watches television and performs crafts throughout the day. (Tr. 229). Plaintiff also reported that she cooks, shops, reads, talks on the telephone, visits relatives, and cares for her personal needs. (Tr. 231-32).

Physical therapy treatment notes dated November 11, 2004, reveal that Plaintiff exhibited "full and pain free" range of lumbar motion with extension and lateral movements. (Tr. 561). Plaintiff rated her back pain as "0/10 with standing, walking, and all extension based activity." *Id.*

At the November 29, 2004 administrative hearing, Plaintiff testified that she is unable to walk even two blocks, can stand for only 5-10 minutes, can lift only three pounds, and cannot sit without suffering pain. (Tr. 627-29).

**ANALYSIS OF THE ALJ'S DECISION**

**A. Applicable Standards**

The social security regulations articulate a five-step sequential process for evaluating disability. *See* 20 C.F.R. §§ 404.1520(a-f), 416.920(a-f).[2] If the Commissioner can make a dispositive finding at any point in the review, no further finding is required. *See* 20 C.F.R. §§ 404.1420(a), 416.920(a). The regulations also provide that if a claimant suffers from a nonexertional impairment as well as an exertional impairment, both are considered in determining his residual functional capacity. *See* 20 C.F.R. §§ 404.1545, 416.945.

**B. The ALJ's Decision**

The ALJ determined that Plaintiff suffers from the following severe impairments: (1) a back disorder; and (2) status post L4-5 surgery for decompression. (Tr. 23). The ALJ concluded that these impairments, whether considered alone or in combination, failed to satisfy the requirements of any impairment identified in the Listing of Impairments detailed in 20 C.F.R., Part 404, Subpart P, Appendix 1. *Id.* The ALJ determined that while Plaintiff was unable to perform her

---

[2] 1.  An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. 404.1520(b));

2.  An individual who does not have a "severe impairment" will not be found "disabled" (20 C.F.R. 404.1520(c));

3.  If an individual is not working and is suffering from a severe impairment which meets the duration requirement and which "meets or equals" a listed impairment in Appendix 1 of Subpart P of Regulations No. 4, a finding of "disabled" will be made without consideration of vocational factors (20 C.F.R. 404.1520(d));

4.  If an individual is capable of performing work he or she has done in the past, a finding of "not disabled" must be made (20 C.F.R. 404.1520(e));

5.  If an individual's impairment is so severe as to preclude the performance of past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if other work can be performed (20 C.F.R. 404.1520(f)).

past relevant work, there existed a significant number of jobs which she could perform despite her limitations. (Tr. 23-25). Accordingly, the ALJ concluded that Plaintiff was not disabled as defined by the Social Security Act.

### 1. The ALJ's Decision is Supported by Substantial Evidence

Plaintiff bears the burden of demonstrating her entitlement to benefits, and she can satisfy her burden by demonstrating that her impairments are so severe that she is unable to perform her previous work, and cannot, considering her age, education, and work experience, perform any other substantial gainful employment existing in significant numbers in the national economy. *See* 42 U.S.C. § 423(d)(2)(A); *Cohen*, 964 F.2d at 528.

As noted above, the Commissioner has established a five-step disability determination procedure. While the burden of proof shifts to the Commissioner at step five, Plaintiff bears the burden of proof through step four of the procedure, the point at which her residual functioning capacity (RFC) is determined. *See Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997) (ALJ determines RFC at step four, at which point claimant bears the burden of proof).

With respect to Plaintiff's residual functional capacity, the ALJ determined that Plaintiff retained the capacity to perform sedentary work subject to the following limitations: (1) she can lift/carry no more than 10 pounds; (2) during an 8-hour workday she can stand/walk for two hours and sit for six hours; (3) she must periodically alternate between sitting and standing; (4) she can only occasionally balance, stoop, kneel, crouch, crawl, and climb ramps/stairs; (5) she cannot climb ladders, ropes, or scaffolds. (Tr. 23). After reviewing the relevant medical evidence, the

Court concludes that the ALJ's determination as to Plaintiff's RFC is supported by substantial evidence.

The ALJ determined that Plaintiff was unable to perform her past relevant work, at which point the burden of proof shifted to the Commissioner to establish by substantial evidence that a significant number of jobs exist in the national economy which Plaintiff could perform, her limitations notwithstanding. *See Richardson*, 735 F.2d at 964.

While the ALJ is not required to question a vocational expert on this issue, "a finding supported by substantial evidence that a claimant has the vocational qualifications to perform specific jobs" is needed to meet the burden. *O'Banner v. Sec'y of Health and Human Services*, 587 F.2d 321, 323 (6th Cir. 1978) (emphasis added). This standard requires more than mere intuition or conjecture by the ALJ that the claimant can perform specific jobs in the national economy. *See Richardson*, 735 F.2d at 964. Accordingly, ALJs routinely question vocational experts in an attempt to determine whether there exist a significant number of jobs which a particular claimant can perform, her limitations notwithstanding. Such was the case here, as the ALJ questioned vocational expert Dan O'Neil.

The vocational expert testified that there existed approximately 14,300 jobs which an individual with Plaintiff's RFC could perform, such limitations notwithstanding. (Tr. 637-40). This represents a significant number of jobs. *See Born v. Sec'y of Health and Human Services*, 923 F.2d 1168, 1174 (6th Cir. 1990); *Hall v. Bowen*, 837 F.2d 272, 274 (6th Cir. 1988). The vocational expert was also asked to consider whether there existed any jobs which Plaintiff could perform if she were further limited as follows: (1) she can walk no more than one block; (2) she can stand for 10 minutes; (3) she can lift only three pounds; (4) she requires a sit-stand option; and (5) experiences

14

difficulties reaching overhead with her non-dominant upper extremity. (Tr. 640-41). The vocational expert testified that there existed approximately 3,500 jobs which an individual so limited could perform, such limitations notwithstanding. (Tr. 641). This likewise represents a significant number of jobs. *See Born*, 923 F.2d at 1174; *Hall*, 837 F.2d at 274.

a. The ALJ Properly Discounted Plaintiff's Subjective Allegations

At the administrative hearing Plaintiff testified that she was presently taking pain medication (Naprosyn) which caused her to experience drowsiness. (Tr. 623). Plaintiff testified that within 10-15 minutes of taking this medication she is forced to nap for 1-3 hours. *Id.* Plaintiff asserts that this alleged side effect of her medication renders her incapable of performing any work activities. The ALJ discounted this assertion, however, finding that Plaintiff's testimony was "not entirely credible" and inconsistent with the objective medical evidence and Plaintiff's reported activities. (Tr. 23).

As the Sixth Circuit has long recognized, "pain alone, if the result of a medical impairment, *may* be severe enough to constitute disability." *King v. Heckler*, 742 F.2d 968, 974 (6th Cir. 1984) (emphasis added). As the relevant Social Security regulations make clear, however, a claimant's "statements about [her] pain or other symptoms will not alone establish that [she is] disabled." 20 C.F.R. § 404.1529(a); *see also*, *Walters v. Commissioner of Social Security*, 127 F.3d 525, 531 (6th Cir. 1997) (quoting 20 C.F.R. § 404.1529(a)). Instead, as the Sixth Circuit has established, a claimant's assertions of disabling pain and limitation are evaluated pursuant to the following standard:

> First, we examine whether there is objective medical evidence of an underlying medical condition. If there is, we then examine: (1) whether objective medical evidence confirms the severity of the alleged pain arising from the condition; or (2) whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain.

*Walters*, 127 F.3d at 531 (citations omitted). This standard is often referred to as the *Duncan* standard. *See Workman v. Commissioner of Social Security*, 2004 WL 1745782 at *6 (6th Cir., July 29, 2004).

Accordingly, as the Sixth Circuit has repeatedly held, "subjective complaints may support a finding of disability only where objective medical evidence confirms the severity of the alleged symptoms." *Id.* (citing *Blankenship v. Bowen*, 874 F.2d 1116, 1123 (6th Cir. 1989)). However, where the objective medical evidence fails to confirm the severity of a claimant's subjective allegations, the ALJ "has the power and discretion to weigh all of the evidence and to resolve the significant conflicts in the administrative record." *Workman*, 2004 WL 1745782 at *6 (citing *Walters*, 127 F.3d at 531).

In this respect, it is recognized that the ALJ's credibility assessment "must be accorded great weight and deference." *Workman*, 2004 WL 1745782 at *6 (citing *Walters*, 127 F.3d at 531); *see also*, *Heston v. Commissioner of Social Security*, 245 F.3d 528, 536 (6th Cir. 2001) ("[i]t is for the [Commissioner] and his examiner, as the fact-finders, to pass upon the credibility of the witnesses and weigh and evaluate their testimony"). It is not for this Court to reevaluate such evidence anew, and so long as the ALJ's determination is supported by substantial evidence, it must stand. The ALJ found Plaintiff's subjective allegations not to be fully credible, a finding that should

not be lightly disregarded. *See Varley v. Sec'y of Health and Human Services*, 820 F.2d 777, 780 (6th Cir. 1987).

As Defendant correctly observes, there is no evidence in the medical record that Plaintiff ever reported her complaints of drowsiness to her care providers. Moreover, as the ALJ correctly concluded, Plaintiff's subjective allegations of pain and limitation are inconsistent with both the objective medical evidence and Plaintiff's reported activities. In sum, it is not disputed that Plaintiff suffers from severe impairments. However, the ALJ's decision to discount Plaintiff's subjective allegations regarding the alleged side effects of her medication is supported by substantial evidence.

b. Plaintiff's Request to Re-Open her Previous Disability Applications

Plaintiff has submitted several applications for disability benefits. Plaintiff's first three applications were denied at the administrative level and, as previously noted, Plaintiff did not further pursue any of these applications. Following the denial of her fourth application (the application presently under consideration), Plaintiff requested a hearing before an ALJ. With respect to Plaintiff's three previous applications, the ALJ determined that "[s]ince the current application was filed within one year of the initial denial of the previous application, [Plaintiff's third application for benefits] is hereby reopened." (Tr. 16). The ALJ did not, however, reopen Plaintiff's first two applications. Plaintiff asserts that she requested that her first two applications be reopened as well. Plaintiff asserts that the ALJ erred by failing to also reopen (and reconsider) her first two disability applications.

Except in cases presenting "a colorable constitutional issue," social security claimants are bound by the principles of res judicata. *Drummond v. Commissioner of Social Security*, 126 F.3d 837, 841 (6th Cir. 1997). As previously noted, Plaintiff's prior applications for benefits were denied. Because she did not challenge these decisions, they became the Commissioner's final decision in the matter. *See* 20 C.F.R. § 416.1487(a). The relevant regulations do provide, however, that a prior disability determination may be reopened under the following limited circumstances:

> (a) within 12 months of the date of the notice of the initial determination, for any reason;
>
> (b) within two years of the date of the notice of the initial determination if we find good cause, as defined in § 416.1489, to reopen the case; or
>
> (c) at any time if it was obtained by fraud or similar fault.

20 C.F.R. § 416.1488.

Plaintiff's first two applications for benefits were denied more than 12 months prior to the submission of the present application, thus § 416.1488(a) is inapplicable. Plaintiff does not allege that either of her first two applications were denied on the basis of fraud or similar fault, thus § 416.1488(c) is inapplicable. Plaintiff has not demonstrated (or even alleged) that there exists good cause to reopen her first two applications for benefits, thus § 416.1488(b) is inapplicable. Finally, because Plaintiff has neither demonstrated nor alleged that her previous disability applications present a colorable constitutional issue the doctrine of res judicata precludes reopening Plaintiff's first two disability applications.

**CONCLUSION**

For the reasons articulated herein, the undersigned concludes that the ALJ's decision adheres to the proper legal standards and is supported by substantial evidence. Accordingly, it is recommended that the Commissioner's decision be **affirmed**.

OBJECTIONS to this report and recommendation must be filed with the Clerk of Court within ten (10) days of the date of service of this notice. 28 U.S.C. § 636(b)(1)(C). Failure to file objections within the specified time waives the right to appeal the District Court's order. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).


Date:  February 21, 2007                            /s/ Ellen S. Carmody
                                                    ELLEN S. CARMODY
                                                    United States Magistrate Judge